UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CITY OF WARWICK,
      Plaintiff

v.                                      C.A. No. 08-366ML

LABORERS' INTERNATIONAL
UNION OF NORTH AMERICA
NATIONAL (INDUSTRIAL) PENSION FUND,
      Defendant

**MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Mary M. Lisi, Chief United States District Judge.

This case is before the Court on the motion of the Laborers' International Union of North America National (Industrial) Pension Fund (the "Fund") to dismiss the declaratory judgment action brought by the City of Warwick (the "City") on the ground that the City has failed to exhaust administrative remedies. For the reasons stated, the motion to dismiss is granted.

### I. Background

In 1976, the City entered a collective bargaining agreement ("CBA") with the Public Employees Local Union 1033 of the Laborers' International Union of North America, AFL-CIO ("LIUNA") in connection with the City's employment of crossing guards. Compl. ¶ 5. As provided in the CBA, the City agreed to make contributions to the Fund for the purpose of providing retirement benefits for the crossing guards. Compl. ¶ 6. In addition, the City signed an Agreement and Trustee Designation (the "Designation") in 1976, under which the City was bound by the terms and provisions in the

Agreement and Declaration of Trust ("ADT") which established the Fund in 1967. Def.'s Exh. B.

For the next more than three decades, the City entered into a series of CBAs for the crossing guards' employment and continued to make contributions to the Fund. Shortly before the latest CBA was scheduled to expire in June 2007, the City and the crossing guards began negotiating a new CBA. Compl. ¶ 25. Although a tentative agreement was reached, the City council voted against ratification of the new CBA. Compl. ¶26. In November 2007, the City terminated employment of its crossing guards and contracted for crossing guard services on a daily basis.[1] Id. According to the City, it discontinued making pension payments after February 15, 2008, "[a]s there was no longer a [CBA] in place." Compl. ¶ 27.

In a letter dated June 27, 2008, the Fund informed the City that the City's obligation to contribute to the Fund terminated as of February 25, 2008; that such termination constituted a withdrawal; and that the Fund was required by federal law to assess and collect a withdrawal liability from the City. Compl. ¶29, Ex. B. The Fund's actuaries estimated a withdrawal liability of $198,444 and the Fund suggested a six-year installment plan to the City which called for a first payment of $9,769 on July 31, 2008. Compl. Ex. B. The Fund also advised the City that it could request

---

[1] The crossing guards filed charges with the Rhode Island State Labor Relations Board (the "Labor Relations Board") and sought to be reinstated to their prior positions. Compl. ¶ 28. The Labor Relations Board issued a complaint against the City which is currently pending.

a review of the Fund's assessment within ninety (90) days, but that payment had to be made in the interim. Id.

In a letter dated September 18, 2008, the Fund notified the City that it was in default for non-payment; that the time period to request a review was about to expire; and that the Fund would initiate collection proceedings if the default were to continue. Compl. Ex. D. In response, the City made a formal demand for review on September 26, 2008 and requested additional information to help it identify possible inaccuracies in the Fund's assessment. Compl. Ex. C. The City also suggested that its "defined contribution plan" was exempted from federal withdrawal liability provisions and it asked the Fund to consider whether a withdrawal had actually occurred while the labor dispute over termination of the crossing guards was still pending. Id.

On October 3, 2008, the City filed a declaratory judgment action in this Court to establish that the City is not subject to withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §1381 et. seq. ("MPPAA"); and to enjoin the Fund from enforcing any withdrawal liability assessed against the City. Compl.¶ 1, 8. In the alternative, the City sought a declaration that it has not completely withdrawn from the Fund because contributions have merely been suspended during a labor dispute. Id. at ¶ 2, 9.

The Fund now moves to dismiss the City's declaratory judgment action pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that

federal law requires the parties to participate in arbitration proceedings before seeking judicial review. The motion is styled as a "motion to dismiss or, in the alternative, for summary judgment," and the Fund has submitted copies of the CBAs and related documents, including the ADT, in support of its motion.

A 12(b)(6) motion must be converted into a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R.Civ. P. 12(d). As an exception to the general rule, a court may take into account documents which are expressly linked to the pleading and the authenticity of which are not challenged. Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). Here, the City itself attached to the complaint copies of the last CBA and its correspondence with the Fund and it expressly denied therein that it was bound by the ADT. Compl. ¶21. Moreover, the City has not requested to strike the Fund's submitted documents or questioned their authenticity. Accordingly, the Court has included the documents in its review and will treat the Fund's motion as a motion to dismiss.

## II. Standard of Review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all well - pleaded allegations and draw all inferences in favor of the party resisting the motion. In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 200 (1st Cir. 2005). However, "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim

. . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion. Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240 (1st Cir. 2006). Because only well-pleaded facts are taken as true, a court "will not accept a complainant's unsupported conclusions or interpretations of law." Washington Legal Foundation v. Mass. Bar, 993 F.2d 962, 971 (1st Cir. 1993).

### III. Discussion

A. Withdrawal Liability

In 1974, Congress enacted the Employment Retirement Income Security Act ("ERISA") to "provide comprehensive regulation for private pension plans;" to "prescrib[e] standards for the funding, management and benefit provisions of these plans;" and to "establish a system of pension benefit insurance" through the Pension Benefit Guaranty Corporation ("PBGC"). Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 214, 106 S.Ct. 1018, 1020, 89 L.Ed.2d 166 (1986). The aim of the legislation was to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans" and to ensure that if a worker "has fulfilled whatever conditions are required to obtain a vested benefit - he will actually receive it." Id. at 214, 106 S. Ct. at 1020 (citing Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 723, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984).

A noted problem with multiemployer plans was the issue of employer withdrawals which reduce a plan's contribution base and shift the liability to the remaining contributing employers. Giroux Bros. Transp., Inc. v. New England Teamsters, 73 F.3d 1, 2-3 (1st Cir. 1996)(noting "crisis facing multi-employer pension plans from which employers had withdrawn in increasing numbers, leaving the plans without adequate funds to pay vested employee benefits"). To alleviate the problem, the PBGC proposed new regulations "under which a withdrawing employer would be required to pay whatever share of the plan's unfunded liabilities was attributable to that employer's participation." Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. at 723, 104 S.Ct. at 2714.

In 1980, Congress amended ERISA by enacting the MPPAA in order to "strengthen multiemployer pension plans financially by discouraging employers from withdrawing and leaving a plan with unfunded liabilities." Keith Fulton & Sons, Inc., v. New England Teamsters and Trucking Indus. Pension Fund, Inc., 762 F.2d 1137, 1139 (1st Cir. 1985); Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1243 (3d Cir. 1987)(MPPAA intended to "'protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans.'")(citation omitted). By assessing a withdrawal liability on employers leaving a multiemployer pension plan, the MPPAA protects the financial base of pension plans that are liable for unfunded vested benefits. Without such protection, employers may rush to withdraw from a financially weak plan and

leave the remaining participants to bear the cost of the plan, or deprive employees of their retirement benefits. Keith Fulton & Sons, Inc., v. New England Teamsters and Trucking Indus. Pension Fund, Inc., 762 F.2d 1124, 1129-30 (1984).

Generally, an employer is deemed to have withdrawn from a multiemployer pension plan when the employer "permanently ceases to have an obligation to contribute under the plan, or ceases all covered operations under the plan." 29 U.S.C. § 1383(a). In that event, the employer is required to continue funding a proportionate share of the pension plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391; Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. at 725, 104 S.Ct. at 2715 (withdrawing employer is liable for "proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of benefits and the current value of the plan's assets").

"As soon as practicable" after a withdrawal, the plan sponsor is required to "(A) notify the employer of -- (i) the amount of the liability, and (ii) the schedule for liability payments, and (B) demand payment in accordance with the schedule." 29 U.S.C. § 1399(b)(1). The withdrawal liability must be paid by the employer "notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule." 29 U.S.C. § 1399(c)(2); Debreceni v. Merchants Terminal Corp., 889 F.2d 1, 5 (1st Cir. 1989)("'[P]ay now, dispute later' feature of the MPPAA . . . functions to preserve plan cash flow and to thwart the use of dilatory tactics by employers")(internal citation omitted).

The MPPAA further provides that any dispute related to a multiemployer fund's determination of withdrawal liability must be resolved through arbitration. 29 U.S.C. §1401(a)(1); <u>Keith Fulton & Sons, Inc., v. New England Teamsters and Trucking Industry Pension Fund, Inc.</u>, 762 F.2d at 1139 (Employer who disputes "either the amount or the fact of liability. . . can negotiate with the pension plan, and, if there is no resolution, the dispute must be arbitrated"). Either party may then bring an action in a federal district court to "enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2).

B. Governmental Plan Exception

The City seeks to avoid the Fund's demand for withdrawal liability primarily by asserting that it established a governmental pension plan exempted from MPPAA regulations or, in the alternative, that it had not completely withdrawn from the Fund as the crossing guards' claim with the Labor Relations Board had not yet been decided. Neither of those arguments is persuasive.

A multiemployer pension plan is exempted from federal regulation if it is a "governmental plan," which is defined in the MPPAA as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. §§ 1003(b)(1), 1002(32). In order to qualify for the exemption, a government employer must demonstrate that it "established or maintained" its pension benefit plan. <u>Lovelace v. Prudential Ins. Co. of America</u>, 775 F.Supp. 228,

229 (S.D.Ohio 1991). Although the MPPAA does not furnish a more precise explanation, several courts have held that a benefit plan provided by public employers to their employees may still qualify for the exemption even if it is administered by a private insurer. Silvera v. Mutual Life Ins. Co. of New York, 884 F.2d 423, 426-27 (9th Cir. 1989)(Group benefits policy purchased by city for its employees qualified as "governmental plan"); Lovelace v. Prudential Ins. Co., 775 F.Supp. at 229 (Group health policy issued to public educational institutions exempt from ERISA).

On the other hand, when a state or local government body "voluntarily accept[s] a private welfare benefit plan for its employees it cannot later complain that ERISA regulation of that plan invades its sovereignty." Livolsi v. City of New Castle, Pennsylvania, 501 F.Supp. 1146, 1150 (W.D. Penn. 1980)(City and Sanitation authority which chose private welfare benefits plan for their employees subjected themselves to federal jurisdiction under ERISA). Moreover, if non-governmental employers participate in the plan, the exemption does not apply. Id. at 1148 (Multiemployer welfare fund to which private and public employers contributed was not exempt from MPPAA); Brooks v. Chicago Hous. Auth., 1990 WL 103572 at *2 (N.D. Ill., July 5, 1990)(holding that "whole plan should not be exempt from ERISA merely because a governmental body participates in the plan").

The cases cited by the City in support of its exemption argument all involve pension plans established exclusively by governmental or public service organizations for the benefit of

their employees. See, e.g., <u>Roy v. Teachers Ins. and Annuity Ass'n</u>, 878 F.2d 47 (2d. Cir. 1989)(optional retirement plan established by the State of New York to provide benefits for state university faculty); <u>Silvera v. Mutual Life Ins. Co. of New York</u>, 884 F.2d 423 (9th Cir. 1989)(Group benefit insurance policy purchased by City for its employees; <u>Rose v. Long Island R. R. Pension Plan</u>, 828 F.2d 910 (2d. Cir. 1987)(pension plan established and maintained by public railroad for its employees); <u>Lovelace v. Prudential Ins. Co. of America</u>, 775 F.Supp. 228 (S.D. Ohio 1991)(Public educational institutions only participants in health insurance policy); <u>Krystyniak v. Lake Zurich Cmty. Unit District</u>, 783 F.Supp. 354 (N.D. Ill. 1991)(member school districts joined for the purpose of establishing self-insurance program for their employees).

In the case now before the Court, the City has not alleged that the Fund serves governmental employers exclusively, nor does it dispute the Fund's representation that the majority of its 850 contributing employers are from the private sector. There is also no evidence that the City "established or maintained" the Fund or that the Fund was established for the primary purpose of establishing pension benefit coverage for governmental employees. As stated in the ADT, the Fund was established by the Union and various employers of its members for the purpose of providing pension benefits and for financing the Fund's operation, ADT Section 2, and the administration of the Fund was performed by its trustees. ADT Section 3. The City's involvement was limited to

making contributions to the already established Fund as required by the agreed upon CBA. In sum, the undisputed facts indicate that the City selected a private multiemployer pension plan that subjected it to ERISA regulations. As such, it does not enjoy exemption from the mandates of ERISA.

C. Complete Withdrawal

Under the MPPAA, a withdrawal is complete when the employer no longer has any "obligations to contribute under the plan" or it has ceased "all covered operations under the plan." 29 U.S.C. § 1383(a). According to the complaint, the last CBA expired on June 30, 2007, Compl. ¶24, and the successor CBA was not ratified by City Council. Compl. ¶26. Thereafter, all crossing guards covered by the plan were replaced by per diem workers and, as the City concedes, no further pension plan payments were made after February 15, 2008 because "there was no longer a collective bargaining agreement in place, and Warwick had contracted out the work." Compl. ¶ 27. Consequently, the City's suggestion now that it has "not withdrawn from the Fund because it has merely suspended contributions during a labor dispute involving its employees," Compl. Section K, is also lacking in factual support.

However, there is no need for the Court to consider this issue at this time. Having determined that the Fund does not fall within the "governmental plan" exception, the MPPAA mandates that any dispute between the parties "concerning a determination made under sections 1381 through 1399 . . . shall be resolved through arbitration." 29 U.S.C. § 1401(a). Consequently, the determination

whether the City's termination of the crossing guards and discontinuance of contributions to the Fund constitutes "complete withdrawal" will be made by the arbitrator.  See Giroux Bros. Transp., Inc. v. New England Teamsters, 73 F.3d at 4 (dispute regarding withdrawal liability is "statutorily committed to arbitration. . . [t]his is no less so because it may also involve a measure of statutory interpretation.")(citing Vaughn v. Sexton, 975 F.2d 498, 502 (8th Cir. 1992), cert. denied, 507 U.S. 915, 113 S.Ct. 1268, 122 L. Ed. 2d 664 (1993)(citing cases of 2d, 3d, 4th, 6th and D.C. circuits)).

## Conclusion

For the reasons set forth above, the Fund's motion to dismiss is GRANTED.


SO ORDERED.


_/s/ Mary M. Lisi_
Mary M. Lisi
Chief United States District Judge


February 23, 2009